Nathaniel G. Kelly, Esq. (SBN 262016)
LAW OFFICES OF NATE KELLY
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel:  (415) 336-3001
esquire@natekelly.com

Attorneys for Plaintiff Donald Norman

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| DONALD NORMAN, in the Right of and for the Benefit of Intersango, LLC. | Case No.: |
| | FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| PATRICK STRATEMAN, AMIR TAAKI, JAMIE STRATEMAN, | |
| Defendants, | |
| and | |
| INTERSANGO LIMITED LIABILITY CORPORATION and INTERSANGO, LLC | |
| Nominal Defendants. | |

## NATURE AND SUMMARY OF THE ACTION

1.  Donald Norman ("Norman" or "Plaintiff"), by and through his attorneys, brings this action derivatively, as a shareholder, on behalf of nominal defendants Intersango LLC and Intersango LTD (collectively "Intersango", the "Company", or the "Companies") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based on investigations by himself and his attorneys, as follows:

2.  This shareholder derivative action is brought on behalf of the Company against its officers and managing members, Amir Taaki ("Taaki") and Patrick Strateman ("Strateman"), and against Strateman's mother, Jamie Strateman (hereinafter referred to collectively as "Defendants" or "Individual Defendants"). As against individual defendants Strateman and Taaki, this action seeks to remedy Defendants' breaches of fiduciary duties, and other violations of the law that occurred between June 27, 2011 and the present (the "Relevant Period"), which have caused substantial monetary losses to the Company and to its shareholders, as well as other damages, such as to its reputation and goodwill.  As against Jamie Strateman, this action is for conversion, fraud, conspiracy to commit conversion, conspiracy to commit fraud.

3.  Intersango was created to operate chiefly as a Bitcoin exchange.  Bitcoin ("BTC") is a digital asset and an innovative payment system released as open-source software in 2009.  See, https://BTC.org/BTC.pdf.  The system is peer-to-peer and transactions take place between users without an intermediary.  These transactions are verified by network nodes and recorded in a public distributed ledger called the *block chain*, which uses BTC as its unit of account.  BTC is a cryptocurrency.  It is the first decentralized digital currency and largest in terms of market capitalization.

4.  The Company was originally incorporated in the United Kingdom (UK) as a private limited company, Intersango LTD, on June 27, 2011.  Intersango was also subsequently registered as an LLC in the U.S. on July 5, 2011 in Delaware.

5.  The Company was created upon an agreement by Plaintiff Norman and Defendants Strateman and Taaki that they would own and operate the company as equals.  The partners' business plan indicated that BTC's low transaction fees for international transactions would incentivize adoption and due to the growing internationalization of the world economies, the long term prospects for adoption were good; and further that the value of the BTC (the coins themselves) was extremely likely to rise substantially with increasing adoption.

6.  While the member's consultancy services were primarily responsible for BTC advocacy, its exchange was quite successful, taking, among other fees, fees

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

of a fraction of a BTC for a large number of transactions on a daily basis.  By October 2012, Intersango's exchanges were trading just under 50,000 BTC a month.  See, bitcoincharts.com/markets/;

bitcointalk.org/index.php?topic=63877.320; and

bitcointalk.org/index.php?topic=63877.320.  The partner's business plan turned out to be quite smart.  Not only was Intersango growing within a new and emerging field, it was acquiring a growth asset.  As of June 2016, the value of BTC has increased more than 50 fold since 2012.  See, bitcoincharts.com/charts.  Thus, even without growth in the exchange, Intersango would be generating millions of dollars per day in revenue had it maintained full operations to today and their profits, which were intentionally being kept in BTC (rather than exchanged) would be worth millions more.  To put it simply, Intersango was ahead of the curve.

7.  Norman, Taaki, and Strateman all received equal shares of Intersango.  Corporate governance documents, such as Bylaws and or Operating agreements were not formally entered into by the Parties, who acted and governed the business as if a general partnership.  They were all member managers of Intersango.  Unanimous agreement was required for all major company decisions.  Additionally, they were all assigned various roles in the Company.  In exchange for his one-third share of the Company, Norman agreed to act as the CEO of the Company, although he was generally in charge of only non-technical aspects of

Intersango's operations, and provided the initial operational funding for the Company in excess of $60,000 (described in more detail below). Taaki provided much of the technical expertise for the Company, including but not limited to creating software to assist in the long-term vertical integration strategies of the Company, as well as providing the existing user database of a website and service he had previously created called Britcoin. Strateman was the CTO of Intersango and was in charge of many of the technical aspects of the Company, including security of the Company. Strateman, for security purposes, had exclusive management and control of the BTC database and the BTCs on the Intersango website, which included the profits of Intersango. He later used this power to unilaterally make major corporate decisions, control the company, and prohibit the disbursement of dividends and BTCs to shareholders.

8. Intersango developed gradually to become one of the world's most widely recognized BTC exchange platforms. In the fall of 2012, just when Intersango was starting to become profitable, Strateman used his power and control over the Company's assets to essentially shut Norman and Taaki out of the day-to-day business and operations of Intersango. From that point to the present day, Strateman has used his position of control of Intersango's finances to usurp complete control over management of the Company. He has repeatedly, to the detriment of the Company and its shareholders, made completely unilateral

decisions on behalf of the Company either without seeking the approval of the other member managers or against their express wishes.  Furthermore, he unreasonably discontinued the registration of new users to Intersango's marketplace just when Intersango was profitable enough to not only sustain itself, but thrive. This was undoubtedly the type of major decision that required an approval of the majority of member managers, approval which Strateman never sought nor received. These actions, as well as others described in greater detail below, significantly injured and decreased the value of Intersango.

9.  Strateman breached his fiduciary duty to the Company and abused his exclusive management power over Intersango's exchanges by forcing his will on the Company and preventing its further growth, to the detriment of the Company. Furthermore, at no point did he seek options to sell the Company or its assets to a third party while it was still profitable, enjoyed a reputation as one of the most prominent BTC exchange marketplaces, had an extensive client list for bitcoin related businesses of the time, and when the technology underlying the BTC exchange marketplaces had significant monetary value.  Strateman has also converted corporate funds by refusing to distribute to its shareholders more than 7,000 BTCs held by the no-longer-operating Company.  As of June 17, 2016, the 7,000 unaccounted for BTC, have a market value of over five million dollars ($5,000,000). Indeed, Strateman has been secretive throughout and has refused to

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

be forthcoming with the other member managers of Intersango regarding the finances of the Company so that the other member managers don't even know the value and whereabouts of the BTCs they invested in the Company.  Strateman committed fraud by intentionally misrepresenting material to the other member managers on a number of occasions, including but not limited to 1) that the Company needed to halt all new registrations; and 2) (repeatedly) that he would eventually disburse their share of assets of the Company to them, including dividends and BTCs, when he never had any intention of doing so.  Individual defendant Taaki breached his fiduciary duties as a member manager and director of the Company by refusing to engage with Norman and Strateman to consider the best path for the Company.  Taaki did not exercise his power as a member manager to insist that Strateman cease converting Company assets.  He also, despite Plaintiff's urging, failed to take any actions when Strateman ceased allowing new registration to Intersango's marketplace.  Finally, Taaki failed to insist that Intersango assets such as dividends and BTCs be distributed to shareholders. Essentially, when Strateman usurped complete control over the company, Taaki abandoned and abdicated all of his managerial responsibilities and walked away from his duties as a member manager of the Company.

10. These actions listed above collectively constitute breach of fiduciary duties, on the part of the individual defendants Strateman and Taaki.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

11. Strateman used his position within the Company, whereby he controlled site bitcoins, databases, and user information, to essentially shut out Norman completely from the day-to-day operations of Intersango, and usurp complete control over Intersango.  Shortly thereafter, Strateman and Taaki more or less ceased any meaningful communications with Norman.  Instead, Taaki chose to "wait and see" while Strateman's mother Jamie Strateman became a liaison between Norman and Strateman.

12. Norman made repeated requests for a disbursement of Intersango's assets including dividends and BTCs to himself and to the other shareholders.  His requests were denied.  Instead, Strateman entered into a conspiracy with his mother, Jamie Strateman, both to commit fraud and to commit conversion with respect to Intersango's assets.  Strateman repeatedly misrepresented to Norman that Intersango assets including dividends and BTCs would eventually be distributed to Intersango shareholders. These misrepresentations are discussed in specific detail below.  He was assisted in these misrepresentations by Jamie Strateman.  Furthermore, due to these assurances, Norman delayed taking legal action against Strateman.  Indeed, Strateman believed that without this disbursement, Norman would not even have the financial ability to sue to force the disbursement of Intersango's assets to its shareholders.  To date, Strateman has refused to disburse Intersango assets including dividends and BTCs to shareholders

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

despite repeated requests to do so.  He never had any intention of distributing such assets, and relied on Jamie Strateman's assistance in avoiding such distribution, with the intention from the very beginning to keep all Company assets for himself. These actions together constitute fraud and conversion on the part of Strateman and Jamie Strateman, as well as conspiracy to commit fraud and conversion on the part of Strateman and Jamie Strateman. They also constitute unjust enrichment on the part of Strateman, as to date he has not distributed assets of the company to its shareholders.

13.Strateman also committed violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 when he solicited and accepted Plaintiff's financial investment in the Company without disclosing his true intention in regards to his management of the Company.

## JURISDICTION AND VENUE

## THE PARTIES

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that this action includes a federal question, namely the Securities Acts of 1933 and 1934.  Moreover, given that this action presents a federal question, this court has supplemental jurisdiction over the other claims because they involve the same nucleus of operative facts under the federal claim.  This

9

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in or maintains operational headquarters in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this Court pursuant 20 28 U.S.C. §1391(A) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violations of duties owed to the Company occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

17. Plaintiff Norman is and was, at times relevant hereto, an owner and holder of Intersango stock.  Plaintiff is a member manager of Intersango, and owns 1/3 of Intersango shares.  Plaintiff resides in Serbia.

18.   Nominal defendant Intersango is a Delaware limited liability corporation with its current principal place of operations located in San Francisco, California.

19.   Defendant Strateman is Intersango's CTO, and has served as an officer of Intersango since its inception on June 27, 2011.  Strateman is also a member manager of Intersango, and owns 1/3 of Intersango shares.  Upon information and belief, Strateman is a resident of San Francisco, California.

20.   Defendant Taaki is a member manager of Intersango, and owns 1/3 of Intersango shares.  Upon information and belief, Taaki resides in Syria.  His exact current location is unknown.

21.   Defendant Jamie Strateman is the mother of Strateman, and has played a significant role in the management of Intersango since 2012.  Upon information and belief, defendant Jamie Strateman resides in San Francisco, California.


**DUTIES OF THE INDIVIDUAL DEFENDANTS**

22.   By reason of his position as CTO, and as a member manager and officer of Intersango, and as a fiduciary of Intersango, and because of his ability to control the business and corporate affairs of Intersango, Strateman owed and owes Intersango and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and was and is required to use his utmost ability to control and manage Intersango in a fair, just, honest, and equitable manner.  Individual

11

defendant Strateman was and is required to act in furtherance of the best interests of Intersango and its shareholders so as to benefit all shareholders equally and not in furtherance of his own personal interest or benefit.

23.   By reason of his position as a member manager of Intersango, and as a fiduciary of Intersango, individual defendant Taaki owed and owes Intersango and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and was and is required to use his utmost ability to control and manage Intersango in a fair, just, honest, and equitable manner.  Individual defendant Taaki was and is required to act in furtherance of the best interests of Intersango and its shareholders so as to benefit all shareholders equally and not in furtherance of his own personal interest or benefit.

24.   Each member manager and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.   Strateman, because of his exclusive control over the Intersango's databases, client data, and BTC, was able to and in fact did directly exercise control over the wrongful acts complained of herein.

26.   To discharge his duties, Strateman as a member manager and officer of the Company was required to exercise reasonable and prudent supervision over the

management, policies, practices and controls of the financial affairs of the

Company.  By virtue of such duties, Strateman was required to among other things:

    a.  Allow for the reasonable disbursement of Company assets to shareholders including dividends and BTCs.

    b.  Conduct the affairs of the Company over which he had authority in an efficient, business-like manner so as to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

    c.  Allow other member managers to fully participate in the management of the Company and receive their input and approval before taking actions that would significantly impact the value of the Company, or that could otherwise be characterized as major corporate decision.

    d.  In the event of an unwinding of the Company, and after seeking the approval of the other member managers, to exercise reasonable efforts to find a purchaser for the Company.

27.  Strateman by virtue of his position as a member manager, officer, and fiduciary of the Company owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use

and preservation of its property and assets.  Strateman's actions involve a knowing and culpable violation of his obligations as a member manager and officer of the Company, the absence of good faith on his part, and a reckless disregard for his duties to the Company and its shareholders that Strateman was aware or should have been aware posed a risk of serious injury to the Company.

28.  Taaki's actions and failure to act to protect the best interests of the Company involve a knowing and culpable violation of his obligations as a member manager of the Company, the absence of good faith on his part, and a reckless disregard for his duties to the company and its shareholders that Taaki was aware or should have been aware posed a risk of serious injury to the Company.  Essentially, after Strateman usurped complete control over the Company, Taaki abdicated and abandoned his managerial responsibilities and no longer took an active role in discharging his duties as a member manager of the Company.  Taaki also failed to take steps to prevent Strateman's harmful actions to the Company when he had a fiduciary duty to do so.

## **FACTUAL BACKGROUND**

29.  In April of 2011, Taaki reached out to Norman and asked for Norman's assistance in negotiating consulting rates on behalf of Taaki.  The two had been longtime friends, and they met up in Amsterdam on April 12, 2011, and started working together.

14

30.   Over the next several weeks, Taaki and Norman decided to pursue a business of BTC-related consulting together. In the spring or early summer of 2011, Strateman was brought in to write code for the business and to receive a percentage of the agreements that Taaki and Norman made with clients.

31.   Shortly thereafter, Norman, Taaki, and Strateman agreed to work together to operate and build a platform allowing BTCs to be bought and sold internationally. Each of them would individually own a 1/3 ownership interest in the business, and would receive 1/3 of the profits and benefits of the business.  Their responsibilities would be divided as follows:

> a.   Taaki would provide his technical expertise. Taaki had already developed a site called Britcoin to bring easy access to BTC to residents of the UK, and this site was part of the initial inspiration for Intersango.  Taaki would provide his existing user base under the Britcoin platform.  Taaki was also responsible for developing a BTC library to be used in a competing wallet implementation, and would help Strateman develop the site.

> b.   Strateman would provide his technical expertise.  Strateman was the CTO of Intersango and was a specialist in security. He designed, implemented and maintained asset exchange software, as well as integrated multiple payment processers/banks to facilitate automated

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

accounting and reconciliation.  He had exclusive control over the BTCs deposited in the Company's marketplace.  He was also responsible for maintaining the Intersango website. This power was granted to Strateman so that he could prevent against attack vectors by hackers.

c. Norman would provide the initial funding for the operations. Norman would also help with non-technical aspects of the business. For instance, Norman helped with PR and managing press, searching for banking options, and answering support emails.  Norman was also the CEO of the Company.

32.  The Company was incorporated as a private limited company, Intersango LTD, company number 7683978 in England on June 27, 2011.

33.  Intersango LLC was registered in the U.S. on July 5, 2011.  Intersango LLC had the same division of ownership and shares as Intersango LTD, at 1/3 for Norman, Strateman, and Taaki.  The overhead costs for Intersango were split among Intersango LTD (UK) and Intersango LLC (US).

34.  Both Intersango LTD and Intersango LLC serviced the same website, Intersango.com.  In essence, both Intersango LTD and Intersango LLC functioned as one company.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

35. Over the next year or two, Norman invested between $60,000 and $70,000 in the business. Norman also invested 1,000 BTCs (at the time, BTCs were priced at between $5 and $15 a coin). This money was used to pay for housing, food, numerous international flights and other transportation costs, Company registration expenses, domain costs, Company mail services, banking expenses, double withdrawal expenses, financial losses due to technical issues as the Company grew, new computers and computer related equipment, Skype and other phone credits, salaries of employees, and other general expenses.

36. In the summer of 2011, Taaki initiated a list of withdrawals to process. Later, it was discovered that this list of withdrawals had already been processed by Taaki, and as much as 15,000 GBP might be unaccounted for. Thereafter, Taaki, Strateman, and Norman amended their agreement as follows:

a. Norman agrees to cover the liabilities caused by that day's double withdrawals.

b. Intersango LTD and Intersango LLC and/or Britcoin would monetize as fast as possible instead of continuing to run as a free unsustainable service relying on the accumulated life savings of Norman.

17

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

    c.   Norman would not be responsible or able to pay for housing, food or other general costs after paying for flight tickets for Taaki and Strateman to move back to previous places of residence.

37.   Thereafter, Taaki, Strateman, and Norman met up at the mid-September 2012 BTC conference in London that they were primarily responsible for organizing.  After the conference, the three planned to set up a new living situation where the three of them could live and work together as they previously had done.

38.   Over the two or three months leading up to this September 2012 conference, Intersango LTD and/or Intersango LLC had accumulated enough wealth to finally allow for such an expenditure.

39.   Shortly before the Conference, a report was published in the UK on BTCs, alleging that a large number of BTC transactions were used for illegal purposes. This report made Strateman nervous, and he began to worry that the Company could become subject to investigation by the police since bitcoins were a misunderstood technology, even though the Company was operating legally.

40.   Moreover, on the morning of the Conference, Strateman and Taaki were served in connection with a almost $500,000 lawsuit filed in August 2012 in San Francisco by four bitcoin investors who lost money on an exchange called Bitcoinica, which was acquired by Intersango that year. Bitcoinica was a cloud-based exchange – built in five days by a Singaporean teenager – that was hacked

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

before and after Intersango acquired* it.  Intersango was not responsible - the

acquisition was formally undone as a result of these hacks – but the lawsuit was

not dismissed until early 2016.

41.   Although not know at the time, upon information or belief, at around this

time, Strateman decided that he no longer wanted to deal with the effort required to

manage and run Intersango and decided to cash-out and focus his time on his other

projects instead.

42.   Stratemen made numerous material and false representations about his

reasons, including but not limited to that:

> a.  Stopping new registrations was necessary in order to properly
>
>     defend the lawsuit and preserve company assets;
>
> b.  He was taking all actions in the best interest of maximizing
>
>     shareholder return on investment; and
>
> c.  Later, when Norman stated he  had a friend who could take over the
>
>     site, Strateman stated that closing the site temporarily was necessary
>
>     to protect the Company's members.

43.   Despite the fact that all three member managers believed that the value of

BTCs would continue to grow exponentially, Strateman no longer wanted to deal

with the pressures of managing the Company. To that end, he started seeking ways

to wind-down the company, and to take control of the 7,000 BTCs in Intersango.

19

44.   Strateman then unilaterally decided to shut down the U.S. trading site for Intersango. Intersango's USD market stopped trading on or around October 14, 2012. Strateman misrepresented to Norman at this time that he was worried about the legal implications of USD bitcoin trading and whether licensing issues or regulatory issues were at play. Strateman conveyed to Norman that reopening in the future would be possible if legal situation became more clear or if Intersango had the funds in the future to explore reopening the site to USD bitcoin trading. At the time, Intersango had significant assets in the form of BTCs, but none of the three member managers of Intersango wanted to use these for day to day operations, because they expected the value of BTCs to continue to rise.

45.   Shortly thereafter, Intersango, for all practical purposes, ceased to operate at its usual capacity and stopped accepting new registrations on or about November 18, 2012.  This decision was unilaterally made by Strateman who at this point was exercising complete control over the Company.  This is undoubtedly the type of major corporate decision which would require the approval of the majority of the member managers of Intersango.  Strateman neither sought nor received the approval of the other member managers prior to taking these actions.  Taaki did not protest against Strateman taking these actions which were obviously against the best interests of the Company.  Strateman misrepresented to Norman and Taaki that his actions were necessary because Intersango's profits "couldn't be touched"

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

as a result of the pending litigation, and that Intersango did not otherwise have the funding to continue full operations. Strateman claimed that his actions were in the best interests of the company, and Plaintiff believed him at the time, even though it has since become clear to Norman that shutting down the Company wasn't necessary, and new registrations would have in fact helped the Company since the company profited off of new registrations. Indeed, these actions were not in the best interests of the Company, but rather reflected Strateman's desire to "cash out" and not have to deal with the stress of running the company anymore. He was clearly prioritizing his interests over that of the other shareholders.

46.   At the time that the Company stopped accepting new registrations, an accounting of the balances and liabilities of the company clearly showed that the Company not only had enough funds to continue operating, but that the Company had enough funds to continue to expand at an enormous rate.  Intersango at that point was growing at an exponential rate, while the costs of operation were slowing and only growing at a very minimal and fixed costs rate.  The costs of operation were likely to continue to slow and even to decline moving forward due to the completion of software allowing for automation which would save many man hours.

47.  Due to these as well as increased site recognition and other factors, the site was generating significant profits at the time the site stopped accepting new registrations.  Had the site continued to accept new registrations, the Company would have continued to grow at an increased rate and would have come to represent a very significant percent of the crypto-currency exchange market, a market which is worth over one billion dollars today.  At the time, Intersango was the number two BTC market exchange after Mt. Gox.

48.  Strateman inexplicably prevented the day-to-day operations of Intersango from continuing, thereby hurting the Company and depriving it of the growth and financial success it otherwise would have achieved.  Furthermore, Strateman usurped complete control over the company and prevented other member managers of the Company from taking part in the continued operations of the Company. Taaki did not oppose him in these actions.

49.  At no point did Strateman explore options for selling the Company, despite the fact that by that point, the Company had acquired significant value.  The Company enjoyed significant market recognition as one of the leading BTC exchanges.  Furthermore, there was significant value to the underlying product— the BTC exchange marketplace.  Strateman, Norman, and Taaki had all invested significant time, expert, and expertise into building an exchange that at the time was quite advanced.  Furthermore, the technology, and trade secrets behind

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

underlying the exchange, as well as the customer contact lists all had significant value.  Indeed, there is no logical explanation as to why Strateman would seek to do nothing with this extremely valuable asset, and could in no way be a valid business decision.  Shortly after the Conference, Strateman became unwelcoming and dismissive towards Norman and did not allow Norman to continue to participate in the day-to-day operations of the business.  Norman has since been generally uninvolved in the Intersango LTD and Intersango LLC businesses.  Strateman claimed that his reason for doing so was that Norman had "abandoned them" when he left the UK.

50.   After Norman was effectively shut out of participating in the Intersango business, Norman reached out to Taaki repeatedly and on at least two occasions formally requested Taaki's permission to force Strateman to consider and or take certain actions by asking him to sign a statement to that end.  Taaki indicated to Plaintiff that he felt that they had no choice but to listen to and "trust" Stratemen, who not only had complete control of the website but also had BTC that Plaintiff and Taaki believed likely to be worth millions of dollars.  Thus, although Plaintiff felt that the Company should take different actions he had no choice to rely on Stratemen's unilateral decision, and continue to rely on Stratemen to protect and maximize his investment in the Company and the profits (BTC) therein.

51. Nonetheless, Plaintiff has repeatedly requested that Intersango's assets including dividends and BTCs be distributed to shareholders, including Norman's own one-third ownership stake in Intersango's shares and profits. He also requested an auditing of the Company to ensure the accuracy of any distribution and information on the Company records which would allow him to verify that all liabilities to Intersango users had been fully and properly handled.

52. As early as September 2012, Strateman severely limited his communications with Norman, simply promising that he was "handling it" and Norman had no choice but to rely upon Strateman to manage and take responsibility for everything Intersango, including its assets and 7,000 BTC. Norman was only able to communicate with Strateman irregularly and Strateman deliberately communicated many business details by proxy through his mother, Jamie Strateman. Jamie Strateman also took over managing the Company's tax returns and legal concerns. This delegation of managerial responsibilities to Jamie Strateman was done unilaterally by Strateman, without the consent of Norman. On and off throughout 2013, Strateman threatened Norman and Taaki by stating that if either tried to stop him from taking these actions, Strateman would essentially shut down the company, thus leaving Intersango both unable to operate and unable to pay back users. So essentially, Taaki and Norman, were left with no choice but to acquiesce to Strateman's actions.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

53. After he shut Norman out of the Company, Strateman repeatedly threatened to abandon the Company. Strateman threatened that if he was pressured by Norman and Taaki, he would refuse to hand over the database of the Company. Norman and Taaki both knew that without this database, they would not be able to pay back members who had deposited BTCs on the site, and would be faced with numerous lawsuits, so they had no choice but to acquiesce to Strateman's actions and allow him to exercise complete control over the company.

54. Intersango was involved in another separate lawsuit with a third party in California. In the suit, Intersango was the defendant. Strateman, as well as his mother Jamie Strateman, promised Norman on numerous occasions that after that lawsuit was resolved, Intersango's assets, including dividends and BTCs, would be distributed to shareholders. Norman still believed at this point that Strateman was acting in the best interests of the Company, and that it was only a matter of time until Strateman issued the dividends and BTCs to him and the other shareholders.

55. Upon information and belief, in 2013, Norman met with Strateman in Poland to sign a bank check which would allow a GBP deposit to be deposited into a Polish bank, since at this point the Company's UK banking activities had been shut down. Strateman threatened that if Norman didn't meet him to make the deposit, Strateman would abandon the Company. which would leave all the member managers with no way to defend against lawsuits or pay back the claimants.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

56.   When they met, Norman and Strateman had a conversation regarding the future direction of the Company.  Norman left the exchanged feeling reassured based off of Strateman's comments that Strateman would disburse the BTCs that it owed to Norman and to the other member managers of Intersango.  Strateman also assured Norman that he would continue to operate the site and that his actions at that time were due to temporary legal, tax and accounting problems that were being handled, and which were the reasons why Intersango's money couldn't currently be touched.  Strateman further reassured Norman that after those issues were resolved, Intersango would be able to put the rest of its existing money into reopening operations, or alternatively, the site could be sold/migrated to another business.  Strateman stated that the reason the site hadn't been sold was because Strateman had been too busy preparing for the defense of the lawsuit and dealing with Intersango accounting issues.  At this time, Norman still believed that even though Strateman was exercising complete control of the Company, that the interests of all three member managers were aligned.  Since they all owed a 1/3 interest in the Company, it stood to reason that Strateman would act in the Company's best interests.  However, neither Norman nor Taaki were allowed to assist in the direction of the company or ensuring its success, and Strateman kept them in the dark regarding the financial condition of the company.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

57.   Throughout 2012 and 2013, Strateman was still operating Intersango's website and processing account withdrawals.

58.   On January 14, 2013, Norman emailed Jamie Strateman, stating: "As for Intersango, I'm wondering what the balance sheet is et cetera. I've been asking for a long time and I still haven't heard. Just because Patrick stopped talking to me doesn't mean he doesn't have a responsibility.  I am assuming there are no outrageous expenses happening and there aren't any weird trades going on.  Since it is basically my savings I will want to look at all the expenses at some point. Patrick will have to talk to me at some point about this after the final payments go out so we can wrap things up. If my friend won't buy Intersango, we can simply auction it online which might be the best thing to do anyway."

59.   Jamie Strateman responded by email on January 14, 2013, stating that "Patrick is doing his best to operate Intersango on his own, to defend against the SF lawsuit and move thigs along to resolving it.  He is also working on his own projects.  He is also stuck dealing with attorneys, the lawsuit, and liquidators.  I doubt these are expenses that you would disagree with.  From what I can see, Patrick is working to preserve the value for the 3 of you."

60.   On or around January 30, 2013, Strateman messaged Norman asking him to put out a press release for Intersango stating that "We are now simply looking to move forward and resolve any Intersango related issues which have been delayed

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

due to this process. We thank our users for their support and patience during the past months."

61.   In the end of January 2013, Norman reached out to Strateman by email asking him what was going to happen to the Company's IT, and asking Strateman to explore options for selling the Company's IT.  Norman received a response from Strateman's mother, Jamie Strateman saying that Patrick is handling the lawsuit right now and is focused on that. Jamie Stratemen goes on to say "you'll be happy with how this turns out."

62.   In October 2013, after several more attempts to communicate, Norman started to think that maybe Strateman was being disingenuous; and in or around December 2013, Norman hired a lawyer.  Norman had put a lot of trust in Strateman that he was still acting in the best interests of the company, but the lack of information, coupled with the delay in payment all caused Norman to conclude that it was time to investigate whether Strateman was telling him the truth. Norman asked his lawyer whether he should take action to prevent Strateman from accessing the Company's deposits in the Polish bank.  The lawyer advised him not to take such actions, and to wait until after the lawsuit to see whether Strateman distributed BTCs to him and the other member managers as promised.

63.   On December 6, 2013, Strateman sent an email to Norman and Taaki seeking approval for a corporate action. This establishes that as of January 2014,

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

the company was still operating and Strateman realized and acknowledged that he did still have a fiduciary duty to the other members as well as an obligation to keep the other member managers involved in the company.

64.   Upon the resolution of the lawsuit in late 2015, Strateman communicated to Norman a self-imposed deadline for such a distribution of Intersango's BTCs.

65.   Strateman, using his mother Jamie Strateman as a proxy, asked Norman to have a document notarized on, which stated that Norman would accept to the BTC address any payment as payment of debts that Intersango owes Norman. Statement stated this was necessary in order to have every BTC transaction registered in the key chain to have it cashed out.  Strateman represented to Plaintiff that the amount of BTCs in the Intersango coffers had not changed, meaning there were still over 7000 BTCs on the books.  Norman, following these instructions, had the document notarized and delivered back to Strateman.  Strateman picked up this document, and made a test payment.  Strateman then told Norman that he would pay him within 30 days.

66.   No payment was made within this 30-day deadline. Norman then reached out to Strateman, who at this point ceased answering his phone or responding to Norman in any other way, including when Norman attempted to reach him via email, Skype, whatsapp, and other communication methods.  Strateman has still

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

not distributed Intersango's assets to Norman or the other shareholders, despite Norman's repeated requests that he do so.

67.  At or around this time, in or around March 2016, Jamie Strateman communicate to Norman that the Company no longer had any BTCs, that they had all been used for the litigation defense in the San Francisco lawsuit.

68.  At this point, Norman came to the conclusion that Strateman and his mother Jamie Strateman have been defrauding him all along, and never intended to disburse BTCs to Norman or the other shareholders. It was inconceivable that all the BTCs could have been used on defense. The lawsuit was only for $400,000, and the 7000+ BTCs at that point were worth millions of dollars.

69.  Furthermore, Strateman used Company assets in order to pay for his own legal defenses in the aforementioned lawsuit.  He never sought permission nor approval from Norman or Taaki to use corporate assets in this way, which is a blatant example of self-dealing.  Moreover, he prevented the other member managers from using Company assets to pay for their own legal defenses.

70.  In April 2016, Norman came to the United States with the intention of meeting with Strateman and/or Jamie Strateman and resolving matters. Plaintiff continued to belief that Strateman might still have the best interests of the Company in mind and might fulfill his promises and obligations.  However,

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Strateman spurned all of Norman's efforts, leaving him with no choice but to initiate the current action.

71.   To this day, Strateman has complete control over all of Intersango's BTC assets, and Norman does not even know the full extent of such assets.

72.   Jamie Strateman has undertaken numerous decisions regarding the administration of Intersango, which were harmful to the Company and its shareholders.

73.   Upon information and belief, Strateman has dissolved Intersango LTD unilaterally without seeking the advice or consent of Norman or Taaki, the other member managers of Intersango. This type of major corporate decision requires the approval of the majority of the member managers. Strateman neither requested this approval from the other member managers, in clear breach of his fiduciary duties to Intersango.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74. Plaintiff brings this action derivatively in the right and for the benefit of Company to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duty, unjust enrichment, as well as the aiding and abetting thereof, by individual defendants Strateman and Taaki. Plaintiff also brings this action against individual defendant Strateman and

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Jamie Strateman for fraud and conversion, and conspiracy to commit fraud and conversion.

75.   Intersango is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

76.   Plaintiff Norman will adequately and fairly represent the interests of Intersango in enforcing and prosecuting its rights.

77.   Plaintiff Norman is and was an owner of Intersango stock during all relevant times to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of Intersango stock.

78.   The current member managers of Intersango consists of the following individuals: Norman, Taaki, and Strateman.

79.   Here, Stratemen's decision to stop allowing new registrations to Intersango's BTC exchange and discontinue day to day operations of the Company did not constitute a business decision by the entire board, but rather were the unilateral actions of one board member. Delaware courts apply a slightly different test where the board takes no action.

80.   Here, it is clear that a majority of the board of directors **were not** disinterested or independent with regards to the decision to stop accepting new registrations to BTC marketplace.

81.   Here, Taaki clearly was under Strateman's influence, as Strateman had used his position to usurp complete control over Intersango, and was making all business decisions with Taaki's acquiesance, and Taaki was loathe to oppose Strateman.  Taaki, like Norman, was worried that if he didn't acquiesce to Strateman's actions, Strateman might shut down the Company completely, and refuse to distribute his shares in the Company to him.  Indeed, as discussed above, the board was dominated by Strateman who repeatedly threatened that if Norman and Taaki didn't comply with his demands, he would abandon the Company without turning over the Intersango database to the other member managers which would subject them to litigation from users who had deposited BTCs on the Intersango exchange.

82.   Furthermore, as alleged above, despite repeated requests by Norman, Strateman and Taaki have taken no action to disburse Intersango assets to shareholders, including dividends and BTCs.  Strateman prevented Intersango from expanding and continuing to operate in a day-to-day capacity by refusing to allow new users to register with the site. Strateman also did not explore selling the Company or transferring its operations despite pleas from Norman to do so.  Taaki essentially acquiesced to these actions by failing to prevent them.  These actions indicate that the Company's internal controls and communications were severely deficient, and that there was no independence among the directors, rather

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Strateman was exerting his influence on the whole board. These actions further show that Stratemen was acting in his own best interest as opposed to that of all of Intersango's stockholders, so he cannot be said to be disinterested.

## FIRST CLAIM FOR RELIEF

### Against Individual Defendants Strateman and Taaki For

### Breach of Fiduciary Duty

1.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

2.   Individual defendants Strateman and Taaki breached their fiduciary duties to Intersango. As described by the Court in *Beard Research, Inc. v. Kates,* a claim for breach of fiduciary duty requires proof of two elements: "(1) that a fiduciary duty existed, and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates 8 A.3d 13 573, 601 (De. Ch.)*Here, a fiduciary relationship clearly existed. As member managers of Intersango, individual defendants Strateman and Taaki owed and owe Intersango fiduciary obligations.  By reason of their fiduciary relationship, the individual defendants owed and owe Intersango the highest obligation of good faith, fair dealing, loyalty, and due care.

3.   Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision by engaging in

34

unfair, fraudulent, and/or wrongful acts.Individual Defendant Strateman knew or was reckless or grossly negligent in not knowing that he had significantly injured the Company and its shareholders by usurping complete control over the finances and management of Intersango to force his will on the Company and prevent its further growth to the detriment of the Company.  Strateman's decision to inexplicably discontinue new user registration for the Company's BTC marketplace prevented the Company from further expanding just as it was starting to become profitable. His failure to seek or receive board approval prior to taking this action was a breach of his fiduciary duties to the Company. Furthermore, Strateman prevented the Company from continuing to operate normally and prevented the other member managers from being involved in the day-to-day operations of the Company.  Strateman did not responsibly use Company's assets to pursue avenues of growth for the Company.  Once he unilaterally decided to start to wind-down the Company, Strateman did not seek potential purchasers for the Company at the time when the Company had significant value. Strateman also used Company resources to pay for his own litigation defenses without first seeking approval from the majority of the board of the Company. Finally, Strateman continuously refused to disburse Intersango assets including dividends and BTCs to shareholders of the Company, despite repeated promises to do so.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

4.    As a direct and proximate result of Strateman's failure to perform his fiduciary obligations, Intersango has sustained significant damages. As a result of the misconduct alleged herein, Defendant Strateman is liable to the Company.

5.    Individual Defendant Taaki knew or was reckless or grossly negligent in acquiescing to and not preventing Strateman's actions listed above.  As a member of the Board of Directors of Intersango, Taaki had a fiduciary interest to protect the best interests of the Company.  Taaki failed in these duties and essentially ratified Strateman's actions by allowing him to perform the above referenced actions, even when Norman requested Taaki's cooperation in forcing Strateman to take certain actions to protect the Company.  Essentially, Taaki abandoned and abdicated his role as a member manager of the Company when Strateman usurped complete control over the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

6.    As a direct and proximate result of Taaki's failure to perform his fiduciary obligations, Intersango has sustained significant damages.  As a result of the misconduct alleged herein, Defendant Taaki is liable to the Company.

36

7.    Furthermore, it is important to note here that Plaintiff's claim for breach of fiduciary duty is not time barred by the three-year statute of limitations for such a claim, nor is it barred by the doctrine of laches. It is true that under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act, not when the harmful effects of the act are felt even if the plaintiff was unaware of the wrongful act. However, it has also been found that application of the three-year limit set forth in the statute of limitations "may be tolled until such time as a reasonably diligent and attentive stockholder knew or had reason to know the facts alleged constitute a wrong." (*in re USACafes, L.P. Litig.. in re MAXXAM, Inc./federated Dev. S'holders litig, litman v. prudential bache proprs inc.*) "Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where plaintiff reasonably relies on the competence and good faith of the fiduciary." *In re dean witter P'ship Litig., No* Civ.A.14816 WL 44256 t *6 (Del. Ch. July 17, 1998) *aff'd* 725 A.2d 441 (Del. 1999). To invoke equitable tolling, a claimant must allege a fiduciary relationship, actionable or fraudulent self-dealing, and a lack of inquiry notice. *See, Bovay v. h.m. byllsby & Co.* (equitable tolling requires "an abuse of the fiduciary relationship through actionable self-dealing). *See, also, Kahn v. seaboard corp, in re ebx inc shareholders litig.* (holding that to survive a motion to dismiss

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

based on equitable tolling, the allegations must demonstrate "a reasonable conceivable" base for it to apply).

8.    Here, there was a fiduciary relationship as discussed above, because Strateman was a member manager of Intersango and an Officer of the Company. Furthermore, there was abuse of the fiduciary relationship through actionable self-dealing because Strateman was not thinking about the best interests of the Company but rater his own, and his desire was to avoid the pressure involved with effectively managing the company, and to seize the Company's BTCs and other assets for himself. The specific actions and fraudulent communications he to achieve these goals are discussed in further detail below

## SECOND CLAIM FOR RELIEF

### Against Individual Defendants Strateman and Jamie Strateman

### Conspiracy to Commit Conversion of Corporate Funds

9.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

10.   A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

11.   Strateman hatched a plan to convert Intersango's corporate assets, and he entered in a conspiracy with Jamie Strateman to achieve this objective.  Thus both individual defendants Strateman and Jamie Strateman are liable for conspiracy to convert corporate funds.

12.   In order to be liable for conspiracy, the plaintiff must prove that (1) the defendant was aware of the co-conspirators' planned wrongful act; and (2) the defendant agreed with the co-conspirator and intended that the wrongful act be committed.

13.   Furthermore, a conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and interests of the alleged co-conspirators.  The plaintiff is not required to show that the defendant personally committed a wrongful act or that she knew all the details of the agreement.

14.   Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion are: (1) that the plaintiff owned, possessed, or had a right to possess the property at the time of conversion; (2) that the defendant intentionally and substantially interfered with the plaintiffs property (i.e. by taking possession of the property, preventing the plaintiff from having access to the property, destroying the property, or refusing to return the property after demand for its return); (3) that the plaintiff did not consent; (4) that the plaintiff

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1
2

was harmed; and (5) that defendant's conduct was a substantial factor in causing the plaintiff's harm.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

15.  Here, Strateman never intended to distribute any of Intersango's assets to its other shareholders.  These assets include, but are not limited to the Company's accrued BTC, its website customer lists, and bank relationships.  Strateman repeatedly assured Norman that he would disburse Intersango assets to Norman and other shareholders eventually, but in fact planned all along to keep the assets including the BTCs for himself.  He conspired with Jamie Strateman, his mother in this regard, and had her pass along assurances to Norman that Norman would eventually receive his share of Intersango assets.  He used his mother as a legal proxy in an attempt to avoid legal or civil exposure for the failure to gain approval for the Intersango actions he took upon himself.  There are numerous examples of Strateman and Jamie Strateman passing along false assurances to Norman that BTCs would be distributed to Norman and the other shareholders. This includes but is not limited to:

20
21
22

     a.  Strateman made assurances to Norman that he had every intention of distributing BTCs after the lawsuit when the two met to make a deposit in a Polish Bank in early 2013.

23
24
25

40

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

b. Jamie Strateman as a proxy for Strateman assured Norman by email on January 14, 2013, that Strateman was looking after the interests of all three member managers.

c. In Early 2016, Strateman using his mother Jamie Strateman as his proxy, requested that Norman have a document notarized so that Strateman could disburse Norman's share of Intersango assets to him. At the time, Strateman assured Norman that the amount of BTCs controlled by the Company had not changed. This disbursement never occurred.

d. Finally, Jamie Strateman communicated to Norman that all the BTCs controlled by Intersango had been used in defense of Strateman in a separate lawsuit. This money was not Strateman's own money, but rather at the time was Intersango's money. It is inconceivable that all of this money could have been used for legal defense as at the time, the value of the BTCs owned by the company was worth millions of dollars.

16. Strateman and Jamie Strateman also continually colluded to thwart Norman's access to an accounting of Intersango assets, so that he would not know exactly how much the Company or his shares were worth.  Thus Strateman should be found liable for conspiracy to convert corporate funds and other assets.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

17.   Jamie Strateman's role in conspiring to deny Norman and other shareholders their assets clearly shows she was part of a conspiracy hatched with Strateman to conceal and convert Intersango assets and later claim that such assets no longer existed or were greatly depleted.  Accordingly, Jamie Strateman should be found liable for conspiracy to commit conversion.  By participating in the conspiracy, Jamie Strateman effectively adopted as her own the torts of other co-conspirators within the ambit of the conspiracy.  In this way, she has incurred tort liability co-equal with the immediate tortfeasor, her son Strateman.  See, *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454].

## THIRD CLAIM FOR RELIEF

### Against Individual Defendant Strateman and Jamie Strateman

### Conversion of Corporate Funds and Other Assets

18.   As discussed above, individual defendants Strateman and Jamie Strateman entered into a conspiracy to convert corporate funds and other assets.  Furthermore, they realized the objectives of that conspiracy, and should each be found liable for conversion of corporate funds and other assets.

19.   Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion are: (1) that the plaintiff owned, possessed,

or had a right to possess the property at the time of conversion; (2) that the defendant intentionally and substantially interfered with the plaintiffs property (i.e. by taking possession of the property, preventing the plaintiff from having access to the property, destroying the property, or refusing to return the property after demand for its return); (3) that the plaintiff did not consent; (4) that the plaintiff was harmed; and (5) that defendant's conduct was a substantial factor in causing the plaintiff's harm.

20.   Here, Plaintiff Norman had a right to possess 1/3 of Intersango's assets at the time of conversion, as evidenced by the initial agreement by Plaintiff Norman and defendants Strateman and Taaki.

21.   Strateman intentionally and substantially interfered with Norman's property rights by taking advantage of his position of control over Intersango's finances to refuse to disburse Intersango's assets to its shareholders, including the shares that Norman had a right to possess, even after Norman had made repeated requests that these assets be disbursed to him and other shareholders.  He was assisted in this interference by his mother, Jamie Strateman.

22.   Norman did not consent to Strateman taking complete control over Intersango's assets, and did not consent to him retaining control upon the demand for return of the assets.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

23.   Norman was harmed by Strateman refusing to disburse Intersango assets to shareholders.  Norman was harmed initially when Strateman took advantage of his position and grossly mismanaged Intersango assets (including Norman's share of assets), and has further been harmed by Strateman's continued refusal to return Norman's 1/3 share of Intersango's assets to him.  In this regard, Jamie Strateman's actions were part of the harm as well.

24.   Strateman's actions and his refusal to disburse Intersango shares to Norman and the other Intersango shareholders, with the help of Jamie Strateman were substantial factors in causing Norman's harm.

25.   Finally, upon information and belief, Strateman, and his mother Jamie Strateman, both currently possess all of Intersango's assets, which they have illegally and without authorization converted from the Company.

26.   It is important to note that Courts have held in the past that cash, unless it is specifically identifiable cannot be the subject of a conversion claim. Here, even if the Court were to find that BTCs have the same classification as cash, the BTCs at issue  here *are specifically identifiable*.  All BTCs have a unique code on the blockchain that makes tracking them open and easily ascertainable.  Therefore, once Strateman grants Norman and the Court access to Intersango's digital wallet that is currently under Strateman's control, it will become clear what happened to the specific BTCs at issue.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

# FOURTH CLAIM FOR RELIEF

**Against Individual Defendant Strateman and Jamie Strateman**

**Conspiracy to Commit Fraud**

27.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

28.   A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

29.   Strateman hatched a plan to commit fraud by misrepresenting to Intersango shareholders that Intersango assets would eventually be distributed to them. Strateman entered into a conspiracy with Jamie Strateman to achieve this objective.  Thus both individual defendants Strateman and Jamie Strateman should be found liable for conspiracy to commit fraud.

30.   In order to be liable for conspiracy, the plaintiff must prove that (1) the defendant was aware of the co-conspirators' planned wrongful act; and (2) the defendant agreed with the co-conspirator and intended that the wrongful act be committed.

31.   Furthermore, a conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and interests of

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

the alleged co-conspirators.  The plaintiff is not required to show that the defendant personally committed a wrongful act or that she knew all the details of the agreement.

32.   Under Delaware, a claim for fraud requires "(1) a false representation of material fact; (2) made by a person with knowledge that the representation is false, or with reckless indifference to the truth; (3) an intention to induce the person to whom it was made to act or refrain from acting in reliance upon it; (4) causing that person, in justifiable reliance upon the false statement, to take or refrain from taking action; (5) causing such person to suffer damage by reason of such reliance." *Airborne Health, Inc. v. Squid Soap, LP* 984 A.2d 126, 141-142 (Del. Ch.2009)." Court of Chancery Rule 9(b) requires that '[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity.' The relevant circumstances are 'the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person( s) gained from making the misrepresentation.' *Trenwick Am. Litig. Trust v. Ernst & Young LLP,* 906 A.2d 168, 207-08 (Del. Ch. 2006), *aff d sub nom. Trenwick Am. Litig. Trust v. Billett,* 931 A.2d 438 (Del. 2007). The core test is whether the claim has been pled 'with detail sufficient to apprise the defendant of the basis for the claim.' *Abry Partners,* 891 A.2d at 1050."

46

33. Here, Strateman committed fraud.  It is clear that Strateman, and Jamie Strateman acting as his proxy were engaged in widespread, continuous and systematic actions and statements aimed at defrauding the Company, Norman and the other member managers of the Company of the Company's funds. These comments were (1) false representations of material fact that Intersango assets including all dividends and BTCs would eventually be disbursed to the member managers; (2) made by a Strateman and Jamie Strateman knowing that they were false. (Jamie Strateman acted as Strateman's proxy, and on numerous occasions told Norman that Intersango assets would eventually be distributed to shareholders.  However, both Strateman and his mother Jamie Strateman never intended for assets to eventually be distributed in this way.  To that end, for some time, they have worked in concert to conceal the full extent of Intersango's assets from the plaintiff and have refused his requests for an updated accounting of Intersango's assets and financial condition); (3) these statements were made with the intention to induce Norman and other shareholders to refrain from taking legal action to protect the interests of the Company; (4) these false representations caused Norman to refrain from taking legal action for years, because he believed that Strateman, by virtue of his position of fiduciary responsibility to the Company was working in the best interests of the Company; (5) The Company and Norman

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

suffered in that Strateman and Jamie Strateman have converted all of assets of the Company.

34.   Some specific examples of this fraud are listed below.  These examples fulfill the Court of Chancery Rue 9(b) that fraud cases be pled with particularity by including the identity of the person making the misrepresentation, and what that person gained from making such misrepresentations.

(1) Strateman unilaterally shut down the Company's U.S. trading site on October 14, 2012. At the time he misrepresented to Norman and Taaki that he would reopen the site in the future if Intersango's legal situation became more clear or if Intersango had the funds in the future to continue USD bitcoin trading. Strateman misrepresented that his actions were necessary because Intersango's profits "couldn't be touched" as a result of the pending litigation, and that Intersango did not otherwise have the funding to continue full operations. Strateman claimed that his actions were in the best interests of the company, and Plaintiff believed him at this time. These were misrepresentations because at the time, Intersango had significant assets in the form of BTCs and could have continued to operate. Strateman made these misrepresentations so that Norman and Taaki would refrain from taking any legal or other actions on behalf of themselves or the Company. Upon information and belief, this also provided Strateman and

48

Jamie Strateman with the opportunity to move, convert, and conceal all of the assets of the Company, which they never intended to divide with the other member managers of the Company.

(2) In 2013 Norman met with Strateman in Poland to sign a bank check which would allow a GBP deposit to be deposited into a Polish bank. When they met, Norman and Strateman had a conversation regarding the future direction of the Company. Strateman misrepresented at the time that he would disburse the BTCs that the Company owed to Norman and to the other member managers of Intersango. Strateman also assured Norman that he would continue to operate the site and that the current actions were due to temporary legal, tax and accounting problems which were being handled, and which are the reasons why Intersango's money couldn't be touched. Strateman further reassured Norman that after those issues were resolved, Intersango would be able to put the rest of its existing money into reopening operations, or alternatively, the site could be sold/migrated to another business. At this time, Norman still believed that even though Strateman was exercising complete control of the Company, that the interests of all three member managers were aligned. In fact, Strateman never intended to pay back the Company's BTCs and other assets to the other member managers of Intersango. Strateman made these misrepresentations so that Norman and

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Taaki would refrain from taking any legal or other actions on behalf of themselves or the Company. Upon information and belief, this also provided Strateman and Jamie Strateman with the opportunity to move, convert, and conceal all of the assets of the Company, which they never intended to divide with the other member managers of the Company.

(3) On January 14, 2013, Norman emailed Jamie Strateman, stating: "As for Intersango, I'm wondering what the balance sheet is et cetera. I've been asking for a long time and I still haven't heard. Just because Patrick stopped talking to me doesn't mean he doesn't have a responsibility. I am assuming there are no outrageous expenses happening and there aren't any weird trades going on. Since it is basically my savings I will want to look at all the expenses at some point. Patrick will have to talk to me at some point about this after the final payments go out so we can wrap things up. If my friend won't buy Intersango, we can simply auction it online which might be the best thing to do anyway." Jamie Strateman responded by email on January 14, 2013, stating that "Patrick is doing his best to operate Intersango on his own, to defend against the SF lawsuit and move thigs along to resolving it. He is also working on his own projects. He is also stuck dealing with attorneys, the lawsuit, and liquidators. I doubt these are expenses that you would disagree with. From what I can see, Patrick is working to preserve the

50

value for the 3 of you." This was a clear misrepresentation by Jamie Strateman. Rather than respond to Norman's request regarding access to the finances of the Company, Jamie Strateman was trying to reassure Norman that Strateman was still working in the best interests of the company and all three member managers when this in fact was not the case. These misrepresentations were made so that Norman and Taaki would refrain from taking any legal or other actions on behalf of themselves or the Company. Upon information and belief, this also provided Strateman and Jamie Strateman with the opportunity to move, convert, and conceal all of the assets of the Company, which they never intended to divide with the other member managers of the Company.

(4) In the end of January 2013 Norman reached out to Strateman by email asking him what was going to happen to the Company's IT, and asking Strateman to explore options for selling the Company's IT. Norman receive a response from Strateman's mother, Jamie Strateman saying that  Patrick the lawsuit right now and is focused on that. Jamie Stratemen proceeds to say "you'll be happy with how this turns out." Jamie Strateman made these misrepresentations so that Norman and Taaki would refrain from taking any legal or other actions on behalf of themselves or the Company. Upon information and belief, this also provided Strateman and Jamie Strateman

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

with the opportunity to move, convert, and conceal all of the assets of the Company, which they never intended to divide with the other member managers of the Company.

(5) Upon the resolution of the lawsuit in late 2015/early 2016 Strateman communicated to Norman a self-imposed deadline for such a distribution of Intersango's BTCs.  Strateman, using his mother Jamie Strateman as a proxy, asked Norman to have a document notarized on or around March or 2016, which stated that Norman would accept to the BTC address any payment as payment of debts that Intersango owes Norman. This was necessary in order to have every BTC transaction registered in the key chain to have it cashed out. Strateman represented to Plaintiff that the amount of BTCs in the Intersango coffers had not changed, meaning there were still over 7000 BTCs on the books. Norman, following these instructions, had the document notarized and delivered back to Strateman. Strateman picked up this document, and made a test payment. Strateman then told Norman that he would pay him within 30 days.  No payment was made within this 30-day deadline. Norman then reached out to Strateman, who at this point ceased answering his phone or responding to Norman in any other way.  Strateman has still not distributed Intersango's assets to Norman or the other shareholders, despite Norman's repeated requests that he do so.  Strateman

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

made these misrepresentations so that Norman and Taaki would refrain from taking any legal or other actions on behalf of themselves or the Company. Upon information and belief, this also provided Strateman and Jamie Strateman with the opportunity to move, convert, and conceal all of the assets of the Company, which they never intended to divide with the other member managers of the Company.

(6) At or around this time, Jamie Strateman communicate to Norman that the Company no longer had any BTCs, that they had all been used for the litigation defense in the San Francisco lawsuit.

35.     It is important to note here that Plaintiff's Fraud claim as well as other related claims are not barred by either the three-year statute of limitations for Fraud claims, nor are they barred by the doctrine of Laches.  It is true that under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act, not when the harmful effects of the act are felt even if the plaintiff was unaware of the wrongful act. However, it has also been found that application of the three-year limit set forth in the statute of limitations "may be tolled until such time as a reasonably diligent and attentive stockholder knew or had reason to know the facts alleged constitute a wrong (in re USACafes, L.P. Litig.. in re MAXXAM, Inc./federated Dev. S'holders litig, litman v. prudential bache proprs inc. "under

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where plaintiff reasonably relies on the competence and good faith of the fiduciary." *In re dean witter P'ship Litig., No* Civ.A.14816 WL 44256 t *6 (Del. Ch. July 17, 1998) *aff'd* 725 A.2d 441 (Del. 1999). To invoke equitable tolling, a claimant must allege a fiduciary relationship, actionable or fraudulent self-dealing, and a lack of inquiry notice. *See, Bovay v. h.m. byllsby & Co.* (equitable tolling requires "an abuse of the fiduciary relationship through actionable self dealing"). *See, also,* Kahn v. seaboard corp, in re ebx inc shareholders litig. (holding that to survive a motion to dismiss based on equitable tolling, the allegations must demonstrate "a reasonable conceivable" base for it to apply.

36.   Here, the above specific examples demonstrate that Strateman and Jamie Strateman continuously made misrepresentations so that Norman would refrain from initiating legal action on the Company's behalf against Strateman. Strateman was clearly in a fiduciary relationship as he was a member manager and officer of Intersango, and was essentially unilaterally controlling the company. Finally, these misrepresentations were made to cover up the self-dealing that Strateman and Jamie Strateman were involved in, namely concealing and converting the Company's assets including BTCs.

54

## FIFTH CLAIM FOR RELIEF

**Against Individual Defendants Strateman and Jamie Strateman – Fraud**

37.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

38.    As discussed above, individual defendants Strateman and Jamie Strateman entered into a conspiracy to commit fraud.  Furthermore, they realized the objectives of that conspiracy, and should each be found liable for fraud.

39.    The elements of fraud, which give rise to the tort action for deceit are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud; i.e. to induce reliance; (4) justifiable reliance; and (5) resulting damages.  To maintain any fraud action, a plaintiff must show that he or she changed reliance upon the alleged fraud and was damaged by that change of position.  (Civ. Code § 1709).

40.    Defendant Strateman committed fraud by misrepresenting to Norman and other shareholders that he would disburse dividends and BTCs to them when he never in fact intended to do so, and his motive throughout was to retain such assets for himself.  He was assisted in these actions by Jamie Strateman, who acted as his proxy in dealings with other shareholders, and thus committed fraud herself.

41.    Here, Defendant Strateman made misrepresentations to Plaintiff Norman. First, he misrepresented to Norman that he would eventually disburse Intersango

assets including dividends and BTCs to Intersango's shareholders, including Norman.  Second, upon information and belief, Strateman has concealed the remaining BTCs of the Intersango marketplace in order to claim that no BTCs exist anymore.  Individual defendant Jamie Strateman has also made such misrepresentations, and has assisted Strateman in the concealment of Intersango's assets.

42.   Individual defendants Strateman and Jamie Strateman each together and individually had an intent to defraud and induce reliance, and on numerous occasions, they both told Norman that Norman and other shareholders would eventually receive their share of Intersango's assets.  These assurances were made in order to prevent Norman from taking immediate legal action to recover his assets, thereby providing Strateman and Jamie Strateman with time to conceal and/or use all of the remaining assets in Intersango's BTC marketplace.

43.   Furthermore, Strateman believed that without the disbursement of Intersango's assets, Norman would not have the financial means to bring civil litigation against Strateman for his actions.

44.   Norman justifiably relied on the statements of individual defendants Strateman and Jamie Strateman.  Norman still believed that as a member manager and officer of Intersango, Strateman would act in the Company's best interest and

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

eventually return assets.  Furthermore, he believed Jamie Strateman's statements because she was acting as Strateman's proxy.

45.    Finally, as a result of individual defendants Strateman and Jamie Strateman's actions, Norman and the other shareholders of Intersango have been damaged in that Strateman and/or Jamie Strateman continue to possess and retain almost all of Intersango's assets, have possibly wasted a large amount of such assets, and appear to have no intention of ever distributing anything but possibly a token portion of the assets to any of the Company's shareholders.

46.    Specific examples of these fraudulent representations can be found above under the fourth claim for relief and are incorporated by reference in this section. Furthermore, the statute of limitations should be tolled under the theory of equitable tolling for the same reasons discussed above.


## SIXTH CLAIM FOR RELIEF

### Against Defendant Strateman – Unjust Enrichment

47.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

48.    By his wrongful acts, Defendant Strateman was unjustly enriched at the expense of and to the detriment of Intersango.

49.   Unjust enrichment is "the unjust retention of a benefit to the loss of another against the fundamental principles of equity and good conscience." *Neme v. Shrader, 991 A.2d, 1120, 1130 (Del. 2010).* The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, an (5) the absence of a remedy provided by law."

50.   Here, Strateman had full access to Intersango's assets by virtue of his position with the Company as a member manager and as the CTO.  He was provided with such access so that at all times he could work in the best interests of the Company and promote its growth.  Strateman used this position to unjustly enrich himself. He has retained control of all of Intersango's assets including assets that belonged to individual shareholders Strateman and Taaki, and has refused to distribute any such assets. Furthermore, he has displayed no willingness to ever distribute such assets.

51.   There is an impoverishment because the other member managers of Intersango are owed millions of dollars from the assets that they invested in Intersango, including thousands of BTC.

52.   There is a direct relation between the enrichment and the impoverishment, in that the other member managers are deprived of their share of Intersango's assets since Strateman has taken all such assets for himself.

53. There is an absence of justification, since for all practical purposes, Intersango is no longer a functioning company, and Strateman should divide and distribute the remaining assets amongst the member managers as formally agreed.

54. Finally, there is an absence of other remedies at law for the other member managers to recover their share of assets in Intersango.

## SEVENTH CLAIM FOR RELIEF

### Violations of the Securities Act of 1933 and the Securities Exchange Act of 1934

55. PLAINTIFF, hereby incorporates paragraphs 1-53 as set forth herein.

56. Securities sold in the United States that are not registered with the Securities and Exchange Commission "SEC") under Regulation D must conform to the provisions of SEC Regulation D ("Reg. "D").

57. Reg. D Rule 502 states that unregistered securities must be preceded by disclosures that approximate those which would be disclosed in a formal registration.

58. Prior to receiving PLAINTIFF's monies in exchange for ownership shares in the Company, Strateman disseminated or approved certain material false statements and omissions, including but not limited to i) omitting hat he would not

honor his fiduciary duties to the Company should there be trouble and ii) that his intention was not to take one-third of the profits, but 100%.

## EIGHT CLAIM FOR RELIEF

### Accounting

59.    Plaintiff demands an accounting of all of Intersango's assets.

60.    Under Delaware law, accounting is an equitable remedy that "consists of the adjustment of accounts between parties and a rendering of a judgment of a judgment for the amount ascertained to be due to either as a result." *Garza v. Citigroup Inc.,* No.  CV 15-537-SLR, 2016WL 3566956, at *2 (D. Del. June 29, 2016) (citing *Albert v. Alex.  Brown Mgmt. Servs.,   Inc.,* Civ.No.  762-N, 2005  WL  2130607,  at *11 (Del. Ch. Aug. 26, 2005)).

61.    Plaintiff demands an accounting and an opportunity to examine and inspect corporate books including but not limited to all wallet, site, user and non-user transactions, records, databases, fees, and other variables which may be deemed necessary for proper auditing and verification

62.    Plaintiff demands that individual Defendant Strateman provide all information pertaining to Intersango's BTC wallets, used and current, so that Plaintiff can access information regarding BTC transactions.

63.    The above is all requested so that Plaintiff can determine the full extent of damages on Plaintiff's claims listed above.

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

**Wherefore, Plaintiff demands judgment as follows:**

A. Against individual defendant Strateman and in favor of the Company for the amount of damages, no less than $200,000,000, sustained by the Company as a result of Strateman's breach of fiduciary duties, conversion, fraud, conspiracy to commit conversion, conspiracy to commit fraud, unjust enrichment, gross mismanagement, abuse of control, and to provide a full accounting of Intersango's assets for the relevant period;

B. Against individual defendant Taaki and in favor of the Company for the amount of damages sustained by the Company as a result of Taaki's breach of fiduciary duties, gross mismanagement, and abuse of control;

C. Against individual defendant Jamie Strateman and in favor of the Company, in the amount of no less than $7,000,000 for the amount of damages sustained by the Company as a result of Jamie Strateman's conversion, fraud, conspiracy to commit conversion, and conspiracy to commit fraud;

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching,

impounding, imposing a constructive trust on, or otherwise restricting individual defendant's assets so as to assure that plaintiff on behalf of Intersango has an effective remedy;

E. Awarding to Intersango restitution from individual defendants Strateman and Taaki, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorney's fees and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

Respectfully Submitted,

DATED: October 11, 2016          **LAW OFFICES OF NATE KELLY**

By: _____*Nate Kelly*_____
          Nathaniel G. Kelly

Law Offices of Nate Kelly
388 Market Street, Suite 1300
San Francisco, CA 94111
(415) 336-3001
Esquire@natekelly.com

Attorneys for Plaintiffs

FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


DATED: October 11, 2016          **LAW OFFICES OF NATE KELLY**


By: _____
        *Nate Kelly*
        Nathaniel G. Kelly


Law Offices of Nate Kelly
388 Market Street, Suite 1300
San Francisco, CA 94111
(415) 336-3001
Esquire@natekelly.com

Attorneys for Plaintiffs